**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| JOSEPH J. ADAMS, | : | Civil No. 3:24-cv-1535 |
| | : | |
| Plaintiff | : | (Judge Mariani) |
| | : | |
| v. | : | |
| | : | |
| OFFICER GIST, *et al.*, | : | |
| | : | |
| Defendants | : | |

## <u>MEMORANDUM</u>

Plaintiff Joseph Adams ("Adams"), an inmate housed, at all relevant times, at the State Correctional Institution, Mahanoy, Pennsylvania ("SCI-Mahanoy"), commenced this civil rights action pursuant to 42 U.S.C. § 1983. (Doc. 1). Named as Defendants are Correctional Officer Gist and two John Doe individuals.[1] (*Id.* at 2-3).

Presently before the Court is Defendant Gist's motion (Doc. 28) for summary judgment pursuant to Federal Rule of Civil Procedure 56. The motion is ripe for resolution. For the reasons set forth below, the motion will be granted in part and denied in part.

_____

[1] To date, the John Doe individuals have not been properly identified or served in this case.

I.    **Statement of Undisputed Facts**[2]

Adams was incarcerated at SCI-Mahanoy from February 16, 2024 to September 20,

2024.  (Doc. 29 ¶ 1).  Adams asserts that, on March 12, 2024, Officer Gist and other John

Doe officers assaulted him.  (*Id*. ¶ 3).  Specifically, he alleges that, around 3:45 p.m. on

March 12, 2024, while in the JB block day room, officers, "tackled [him], driving [his] face

and head into the floor."  (*Id*. ¶ 4).  He further alleges that he was "hit in the back of the head

and put in a choke hold of sorts unable to breath[e]."  (*Id*.).  Adams also alleges that he was

put in handcuffs and forced to his feet before being "slammed back on the ground face first

with officers on top of [him] and choking [him] while subdued in handcuffs already."  (*Id*.).

He next claims that he was "put in a restraint char with a bag over [his] head", taken to the

medical wing, and then "rushed to the ER and spent the follow[ing] two days in the trauma

unit."  (*Id*. ¶ 5).  As a result of the use of force, Adams alleges that he sustained "[a] severe

_____

        [2]    Local Rule 56.1 requires that a motion for summary judgment pursuant to Federal Rule of Civil Procedure 56 be supported "by a separate, short, and concise statement of the material facts, in numbered paragraphs, as to which the moving party contends there is no genuine issue to be tried."  M.D. PA. LOCAL RULE OF COURT 56.1.  A party opposing a motion for summary judgment must file a separate statement of material facts, responding to the numbered paragraphs set forth in the moving party's statement and identifying genuine issues to be tried.  *Id*.  Unless otherwise noted, the factual background herein derives from Defendant's Rule 56.1 statement of material facts.  (Doc. 29).  Although Adams filed a brief (Doc. 37) in opposition to Defendant's motion, he failed to file a response to Defendant's statement of material facts.  Therefore, as authorized by Local Rule 56.1, the Court will admit as uncontroverted the statement of facts submitted by Defendants.  *See* M.D. PA. LOCAL RULE OF COURT 56.1 ("All material facts set forth in the statement required to be served by the moving party will be deemed to be admitted unless controverted by the statement required to be served by the opposing party."); *see also Rau v. Allstate Fire & Cas. Ins. Co.*, 793 F. App'x 84, 87 (3d Cir. 2019) (upholding this Court's decision to strike non-movant's non-responsive counterstatement of facts under Local Rule 56.1); *Weitzner v. Sanofi Pasteur Inc.*, 909 F.3d 604, 613 (3d Cir. 2018) (finding that "the District Court is in the best position to determine the extent of a party's noncompliance with Local Rule 56.1, as well as the appropriate sanction for such noncompliance"); *see also* Doc. 33 ¶ 4 (advising Adams that failure to file a responsive statement of material facts would result in the facts set forth in Defendant's statement of material facts being deemed admitted).

level 5 lower lumbar herniation as well as 2 herniated dis[cs] in [his] back", had to have

"stitches in [his] lip[,]" and had a "large bulge on [his] head." (*Id*. ¶ 6). For relief, Adams

seeks compensatory and punitive damages, as well as consequential, incidental, and

nominal damages. (*Id*. ¶ 7).

A.     Facts Related to Exhaustion of Administrative Remedies

Department of Corrections ("DOC") policy DC-ADM 804 concerns the filing and

appeals of inmate grievances. (*Id*. ¶ 8).

It is well-established that under the Prison Litigation Reform Act ("PLRA"), a plaintiff

must exhaust his administrative remedies before bringing his case before the Court. (*Id*. ¶

9). First, a plaintiff must file a grievance within 15 working days of the event upon which he

bases his claim. (*Id*. ¶ 10).

On March 19, 2024, Adams filed grievance number 1079877 alleging that he was

subjected to excessive force. (*Id*. ¶ 11). In the grievance, Adams stated that a "block

officer" restrained him because, as Adams admits, he was involved in a physical altercation

with another inmate. (*Id*. ¶ 12). Adams asserted that the unidentified officer "used

excessive force[ ] and caused extreme pain to [his] back and neck," and "busted [his] lip[.]"

(*Id*. ¶ 13). In accordance with DC-ADM 001, this grievance was treated as an allegation of

abuse, and staff issued Adams notices that the time to provide an initial level response would be enlarged accordingly.[3]  (*Id.* ¶ 14).

On May 21, 2024, Adams received an initial review response ("IRR"), indicating that his claim was found to be without merit.  (*Id.* ¶ 15).  Adams appealed the IRR to the Superintendent, reiterating his allegations of injury, demanding certain evidence be preserved, and reiterating his legal claims.  (*Id.* ¶ 16).  Adams did not name Officer Gist in his appeal.  (*Id.* ¶ 17).  On June 18, 2024, the Facility Manager provided a response and upheld the IRR.  (*Id.* ¶ 18).

On June 23, 2024, Adams filed a final appeal to the Secretary's Office of Inmate Grievances and Appeals ("SOIGA").  (*Id.* ¶ 19).  In this appeal, Adams reiterated his alleged injuries and legal claims.  (*Id.* ¶ 20).  Adams named Officer Gist in this appeal.  (*Id.* ¶ 21).  Upon consideration of his appeal, SOIGA upheld the IRR.  (*Id.* ¶ 22).

B.    Facts Related to the Alleged Use of Force Incident

1.    **Facts Related to the Need for Application of Force**

As Adams admits in his grievance, he fought another inmate in the block's open day area.  (*Id.* ¶ 23).  This is corroborated by: (1) the investigation into the incident; (2) the Extraordinary Occurrence Report ("EOR") generated due to the incident; and (3) the security footage of the JB block dayroom.  (*Id.* ¶¶ 24-26).

---

[3]    The Department of Corrections maintains an "Inmate Abuse" policy at DC-ADM 001.  (Doc. 29-5).  The purpose of DC-ADM 001 is "to ensure that staff do not subject an inmate to corporal or unusual punishment, or personal abuse or injury."  *Prater v. Dep't of Corr.*, 76 F.4th 184, 204 (3d Cir. 2023).

2.    **Facts Related to the Relationship Between the Need for and the Amount of Force that was Used**

The footage of the incident shows Adams on the ground, on top of another inmate, beginning at around the 8 second mark of the video. (*Id*. ¶ 27). At that time, Officer Gist attempted to push Adams off the other inmate. (*Id*. ¶ 28).

Gist is identifiable in the video based upon the separate debrief video, in which he identified himself at that video's 3 minute, 35 second mark. (*Id*. ¶ 29).

Adams resisted Gist, causing a struggle. (*Id*. ¶ 30). Adams' resistance required another officer to assist Gist in restraining Adams. (*Id*. ¶ 31). However, Adams continued to resist and knocked an item out of one of the officer's hands around the video's 25 second mark. (*Id*. ¶ 32). The video then shows that the struggle continued, and two officers attempted to subdue Adams and shackle his hands until about video's 43 second mark, at which point a third officer intervened. (*Id*. ¶ 33). Gist then removed himself from on top of Adams and continued to assist in restraining Adams. (*Id*. ¶ 34).

At the 57 second mark, other officers arrived on the scene. (*Id*. ¶ 35). Gist then grasped Adams' shoulder until about the 1 minute 25 second mark, at which point Adams was brought to his feet. (*Id*. ¶ 36). Gist and another officer then began escorting Adams. (*Id*. ¶ 37). At about the 1 minute 30 second mark, Adams threw his weight away from Gist, twisted his torso towards Gist, and pulled away. (*Id*. ¶ 38). Gist shouted something to Adams and maintained contact with Adams' shoulder. (*Id*. ¶ 39). However, it is the other, unidentified officer holding Adams' right arm, who grabbed and pulled Adams to the ground

in an attempt to regain control of Adams, at about the video's 1 minute 32 second mark.  (*Id.* ¶ 40).  Adams continued to attempt to pull away.  (*Id.* ¶ 41).  At the same time, Gist released his grip on Adams.  (*Id.* ¶ 42).

Another struggle with Adams ensued.  (*Id.* ¶ 43).  Gist approached Adams and knelt at Adams' side and held him down.  (*Id.* ¶ 44).  At this point, several other officers intervened. (*Id.* ¶ 45).

At about the 1 minute 50 second mark, Gist stood and backed away from Adams while the other guards took control of Adams.  (*Id.* ¶ 46).  At the 2 minute 2 second mark, Adams was escorted off the block and exited the view of the camera.  (*Id.* ¶ 47).

Though Gist reappeared at the 3 minute 15 second mark, he left at the 3 minute 29 second mark and did not interact with Adams.  (*Id.* ¶ 48).  At no point did Gist, punch, kick, or otherwise strike Adams.  (*Id.* ¶ 49).

The EOR and the investigation corroborate that minimal, necessary force was used by Gist and other staff members to secure and subdue Adams, as Adams, who was previously fighting with another inmate in an open area, admitted that he was resisting officers even as they intervened to protect the other inmate and reestablish order.  (*Id.* ¶ 50).

### 3.    Facts Related to the Extent of Injury Inflicted

The record demonstrates that Adams sustained a "through and through laceration" to his upper lip.  (*Id.* ¶ 51).  This laceration was cleaned and stitched.  (*Id.* ¶ 52).  Upon

examination, it was noted that Adams' complaints of back pain were not able to be verified

because he was non-cooperative and had been placed in a restraint chair. (*Id*. ¶ 53).

Adams was subsequently taken by ambulance to the hospital to undergo a CT scan

if needed. (*Id*. ¶ 54). However, a report from the attending physician's assistant indicated

no acute injury. (*Id*. ¶ 55). The report also indicated that Adams' symptoms "spontaneously

resolved" and that he was "up and ambulating" at the hospital. (*Id*. ¶ 56).

### 3. Facts Related to the Extent of the Threat to the Safety of Staff and Inmates, as Reasonably Perceived by Responsible Individuals on the Basis of the Facts Known to Them

Defendants maintain that the video footage and statements from seven officer

witnesses and the inmate involved in the fight with Adams demonstrate that they reasonably

believed Adams represented an ongoing, significant threat to other inmates and officers.

(*Id*. ¶ 57). Adams himself admitted that he was engaged in a fight before Gist's intervention.

(*Id*. ¶ 58). Adams also admitted that he continued to resist officers, though he alleges he

did not know who was attempting to restrain him. (*Id*. ¶ 59).

### 4. Any Efforts Made to Temper the Severity of a Forceful Response

Defendants maintain further that, through the whole intervention, Gist attempted to

respond with appropriate force to subdue Adams. (*Id*. ¶ 60). He first wrestled with Adams

and attempted to remove Adams from on top of the other inmate. (*Id*. ¶ 61). Gist continued

to wrestle with Adams in an attempt to shackle him. (*Id*. ¶ 62). Even when Adams

continued to resist, Gist refrained from punching or kicking Adams. (*Id*. ¶ 63).

Once Adams was finally cuffed with the assistance of other officers, Gist grasped Adams' shoulder and raised him to his feet before assuming an escort hold of Adams' arm. (*Id.* ¶ 64). Defendants maintain that Adams continued to resist, turned his body towards Gist and planted his foot in what seemed to be an attempt to break free from Gist's grip and confront Gist. (*Id.* ¶ 65). At that point, Gist yelled something at Adams while maintaining his escort hold, instead of attempting to strike Adams. (*Id.* ¶ 66).

Shortly thereafter, Adams was brought to the ground again, while Gist released his hold. (*Id.* ¶ 67). During this second struggle with Adams, Gist knelt at Adams' side. (*Id.* ¶ 68). He then stood and backed away from Adams while the other guards took control, exiting the view of the camera. (*Id.* ¶ 69).

Though Gist reappeared later, he walked away again and had no further interaction with Adams. (*Id.* ¶ 70). Gist never used any strikes or weapons to intervene. (*Id.* ¶ 71).

## II.    **Legal Standard**

Through summary adjudication, the court may dispose of those claims that do not present a "genuine dispute as to any material fact." FED. R. CIV. P. 56(a). "As to materiality, . . . [o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

The party moving for summary judgment bears the burden of showing the absence of a genuine issue as to any material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106

S.Ct. 2548, 91 L.Ed.2d 265 (1986).  Once such a showing has been made, the non-moving

party must offer specific facts contradicting those averred by the movant to establish a

genuine issue of material fact.  *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888 (1990).

Therefore, the non-moving party may not oppose summary judgment simply on the basis of

the pleadings, or on conclusory statements that a factual issue exists.  *Anderson*, 477 U.S.

at 248.  "A party asserting that a fact cannot be or is genuinely disputed must support the

assertion by citing to particular parts of materials in the record…or showing that the

materials cited do not establish the absence or presence of a genuine dispute, or that an

adverse party cannot produce admissible evidence to support the fact."  FED. R. CIV. P.

56(c)(1)(A)-(B).  In evaluating whether summary judgment should be granted, "[t]he court

need consider only the cited materials, but it may consider other materials in the record."

FED. R. CIV. P. 56(c)(3).  "Inferences should be drawn in the light most favorable to the non-

moving party, and where the non-moving party's evidence contradicts the movant's, then

the non-movant's must be taken as true."  *Big Apple BMW, Inc. v. BMW of N. Am., Inc.*, 974

F.2d 1358, 1363 (3d Cir.1992), *cert. denied* 507 U.S. 912 (1993).

  However, "facts must be viewed in the light most favorable to the nonmoving party

only if there is a 'genuine' dispute as to those facts."  *Scott v. Harris*, 550 U.S. 372, 380, 127

S. Ct. 1769, 1776, 167 L. Ed. 2d 686 (2007).  If a party has carried its burden under the

summary judgment rule,

> its opponent must do more than simply show that there is some metaphysical
> doubt as to the material facts.  Where the record taken as a whole could not

lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial.  The mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact.  When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment.

*Id.* (internal quotations, citations, and alterations omitted).

## III.    Discussion

Defendant Gist seeks summary judgment on the following grounds: (1) Adams failed to properly exhaust his administrative remedies; (2) Adams failed to establish a prima facie case of excessive force; (3) Defendant is entitled to qualified immunity on the excessive force claim; (4) the Court should decline to exercise supplemental jurisdiction over Adams' state tort claims; and (5) Defendant is entitled to sovereign immunity on the state tort claims. (Doc. 30).

### A.    Exhaustion of Administrative Review[4]

Defendant Gist first contends that Adams failed to properly exhaust any grievances against him in the prison's administrative review process prior to proceeding to federal court.  (Doc. 30, at 8-13).

---

[4] Because Defendant Gist raised the issue of exhaustion of administrative remedies, the Court issued an Order notifying the parties that it would consider exhaustion in its role as factfinder in accordance with *Paladino v. Newsome*, 885 F.3d 203 (3d Cir. 2018) and *Small v. Camden Cnty.*, 728 F.3d 265 (3d Cir. 2013), and afforded the parties the opportunity to supplement the record with any additional evidence relevant to exhaustion of administrative remedies.  (Doc. 35).

The Prison Litigation Reform Act of 1995 ("PLRA"), 42 U.S.C. § 1997e *et seq.*, requires prisoners to exhaust available administrative remedies before suing prison officials for alleged constitutional violations. *See id.* § 1997e(a); *Ross v. Blake*, 578 U.S. 632, 639, 642 (2016) (explaining that only "available" remedies must be exhausted). The PLRA "exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." *Porter v. Nussle*, 534 U.S. 516, 532 (2002). It has been made clear that the exhaustion requirement is mandatory. *See Williams v. Beard*, 482 F.3d 637, 639 (3d Cir. 2007); *see also Booth v. Churner*, 532 U.S. 731, 741 (2001) (holding that the exhaustion requirement of the PLRA applies to grievance procedures "regardless of the relief offered through administrative procedures"); *Nyhuis v. Reno*, 204 F.3d 65, 67 (3d Cir. 2000) (same). "[I]t is beyond the power of [any] court…to excuse compliance with the exhaustion requirement." *Nyhuis*, 204 F.3d at 73 (quoting *Beeson v. Fishkill Corr. Facility*, 28 F. Supp.2d 884, 894-95 (S.D.N.Y. 1998)).

To exhaust administrative remedies an inmate must comply with all applicable grievance procedures and rules. *Spruill v. Gillis*, 372 F.3d 218, 231 (3d Cir. 2004). The PLRA requires not only technical exhaustion of the administrative remedies, but also substantial compliance with procedural requirements. *Spruill*, 372 F.3d at 227-32; *see also Nyhuis*, 204 F.3d at 77-78. A procedural default by the prisoner, either through late or improper filings, bars the prisoner from bringing a claim in federal court unless equitable

considerations warrant review of the claim.  *Spruill*, 372 F.3d at 227-32; *see also Camp v. Brennan*, 219 F.3d 279 (3d Cir. 2000).  A procedural default may be excused, however, if the prisoner can show that the administrative remedies were unavailable to him.  *See Rinaldi v. United States*, 904 F.3d 257, 266 (3d Cir. 2018) (stating that "[t]he PLRA requires only 'proper exhaustion,' meaning exhaustion of those administrative remedies that are 'available'" (quoting *Woodford v. Ngo*, 548 U.S. 81, 93 (2006)).  "An administrative remedy is unavailable when it "operates as a simple dead end[,]...is so opaque that it becomes, practically speaking, incapable of use, or when prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation.'"  *Downey v. Pa. Dep't of Corr.,* 968 F.3d 299, 305 (3d Cir. 2020) (quoting *Shifflett v. Korszniak*, 934 F.3d 356, 365 (3d Cir. 2019)).

As stated, the DOC employs a three-step grievance process that must be completed to properly exhaust administrative remedies in most cases.  *See Booth v. Churner*, 206 F.3d 289, 292 n.2 (3d Cir. 2002); *Commonwealth of Pa., Dep't of Corr., Inmate Grievance Sys.*, Policy No. DC-ADM 804 ("DC-ADM 804").  If informal resolution attempts do not resolve the problem, the first step is to file a written grievance (using form DC-804, Part 1) with the Facility Grievance Coordinator within 15 working days after "the event upon which the claim is based."  DC-ADM 804 § 1(A)(3)-(5).  An adverse decision by the Grievance Coordinator may be appealed to the Facility Manager within 15 working days of the initial-review response or rejection.  *Id.* § 2(A)(1).  Finally, the decision of the Facility Manager may be

12

appealed to "Final Review" with the Secretary's Office of Inmate Grievances and Appeals, and again must be submitted within 15 working days of the date of the Facility Manager's decision. *Id.* § 2(B)(1).

The DOC has specific requirements for grievances submitted by inmates. Those requirements include, among other things, that the grievance "be legible [and] understandable"; "include a statement of the facts relevant to the claim" as well as "the date, approximate time, and location of the event(s) that gave rise to the grievance"; that the prisoner "identify individuals directly involved in the event(s)"; and that the grievance include "the specific relief sought," including "compensation or other legal relief normally available from a court." *Id.* § 1(A)(11).

Defendant Gist asserts that Adams filed one relevant grievance—number 1079877. (Doc. 30, at 12-13; Doc. 29 ¶ 3; Doc. 29-4, at 9). On March 19, 2024, Adams filed grievance number 1079877 with respect to the March 12, 2024 incident. (Doc. 29-4, at 9). In the grievance, Adams alleged that he "was restrained by [his] block officer because of a physical altercation w/ another inmate." (*Id.*). He further alleged that "[t]his officer used excessive force[ ] and caused extreme pain to [his] back and neck…and busted [his] lip which needed stitches." (*Id.*). Adams does not name Defendant Gist in the grievance. (*Id.*).

On May 21, 2024, the grievance officer issued an Initial Review Response and found that the grievance was without merit. (*Id.* at 6). The grievance officer found as follows:

Interviews were conducted with you, Inmate witnesses, staff witnesses, and staff involved. CCTV footage of the incident was also reviewed. In your interview you stated that you were actively involved in an altercation with another Inmate. While fighting, Officer Gist gave verbal orders to stop fighting which you stated you ignored. Both Inmates had to be physically separated and you stated that you did not know who tried separating the fight and you continued to actively resist. Inmate witnesses stated that at no time did they witness[ ] any Officers using excessive force. Inmate Witnesses stated that you actively resisted Officers and once restrained the use of force stopped. Staff witnesses also state that you were refusing orders to stop fighting and to be restrained. Force was necessary to comply with orders and once compliance was gained force was no longer being used against you. Once restrained and being escorted off the block you lunged towards the Officer, and you were taken to the ground to again gain compliance. CCTV footage of the incident was also reviewed and is consistent with staff and inmate reports. Only the necessary amount of force was used to gain compliance throughout the incident and once compliance was achieved force was no longer used. The investigation of allegation of abuse was forwarded to [the Bureau of Investigations and Intelligence] for review and they concurred with the findings.

(*Id.*).

Adams appealed the first-level denial to the Facility Manager. (*Id.* at 5). On June

18, 2024, the Facility Manager upheld the initial response that denied the grievance, and

reasoned as follows:

I am in receipt of your grievance appeal in which you restate the claims made in your initial grievance regarding an allegation of abuse.

Upon review of all relevant information, I find that [the grievance officer] properly investigated your claims and provided you with a thorough response. Your allegation of abuse was appropriately investigated via DC-ADM 001 and your allegations could not be substantiated.

As such, I am upholding the decision of the grievance officer and deny this appeal and any request for relief.

(*Id.* at 4).

On June 23, 2024, Adams filed an appeal to SOIGA. (Doc. 29-6). Therein, Adams reiterated his alleged injuries and legal claims. (*Id.*). In his appeal to SOIGA, Adams identified Defendant Gist as the correctional officer who used excessive force against him on March 12, 2024. (*Id.*). Adams' final appeal to SOIGA was denied on August 13, 2024. (Doc. 29-4 at 3).

The Court finds that Defendant did not establish that Adams failed to identify Gist with respect to grievance number 1079877. While Adams did not name Gist in his initial grievance, he named Gist in his appeal to SOIGA. (Doc. 29-6). Additionally, Adams stated in his initial grievance that he "was restrained by [his] block officer" and "this officer used excessive force[ ]" against him. (Doc. 29-4, at 9). Although it is unclear whether Adams was referencing Defendant Gist as this block officer, Defendants have not squarely addressed whether Gist was in fact the block officer on March 12, 2024. However, in the Initial Review Response dated May 21, 2024, the grievance officer references Defendant Gist as one of the officers involved. (Doc. 29-4, at 6).

Furthermore, because this incident was treated as an allegation of abuse, an investigation was conducted pursuant to DC-ADM 001. (*See* Doc. 29-7). During the investigation, Adams identified Gist as the correctional officer who used excessive force against him. (*Id.*). The investigative summary, dated April 10, 2024, stated, "[t]his investigation is predicated on a grievance submitted by Inmate Adams, Joseph QJ8951[.]

Inmate Adams is alleging while being restrained during an altercation with another Inmate, CO Gist used excessive force on him." (*Id.* at 2).

Adams' grievance, and his report of Defendant Gist under DC-ADM 001, alerted prison officials to the alleged use of excessive force. Thus, the prison officials were on notice of the person who was claimed to be doing wrong. *Spruill*, 372 F.3d at 234 (finding that "[t]he purpose of the regulation here is to put the prison officials on notice of the persons claimed to be guilty of wrongdoing. As such, the prison can excuse an inmate's failure to do so by identifying the unidentified persons and acknowledging that they were fairly within the compass of the prisoner's grievance."). The Court will deny summary judgment based on failure to exhaust.

B.    Excessive Force Claim

In an Eighth Amendment excessive force case, the inquiry "is whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." *Hudson v. McMillian*, 503 U.S. 1, 7 (1992). Not "every malevolent touch by a prison guard" violates the Constitution. *Id.* at 9. "The Eighth Amendment's prohibition of 'cruel and unusual' punishments necessarily excludes from constitutional recognition de minimis uses of physical force, provided that the use of force is not of a sort 'repugnant to the conscience of mankind.'" *Id.* (quoting *Whitley v. Albers*, 475 U.S. 312, 327 (1986)). To establish an Eighth Amendment excessive force claim, an inmate does not need to show that he suffered a significant, or even a more than de minimis, injury. *Wilkins v. Gaddy*, 559

U.S. 34, 37 (2010). Rather, the central issue is the force used by the officer, not the resultant injury. *Flood v. Schaefer*, 439 F. App'x 179, 182 (3d Cir. 2011).

When determining whether a prison official has used excessive force, the court must consider the following factors: (1) the need for the application of force; (2) the relationship between the need and the amount of force that was used; (3) the extent of injury inflicted; (4) the extent of the threat to the safety of staff and inmates, as reasonably perceived by the responsible officials on the basis of the facts known to them; and (5) any efforts made to temper the severity of a forceful response. *Whitley*, 475 U.S. at 321; *Brooks v. Kyler*, 204 F.3d 102, 106 (3d Cir. 2000).

Here, Adams' claim ultimately fails because there is insufficient evidence for a reasonable factfinder to conclude that the use of force was maliciously and sadistically intended to cause harm to Adams. Rather, the evidence reveals that Adams' recalcitrant actions inspired the need to use force. The evidence further shows that this use of force incident was modest in scope, duration, and intensity, as Gist did little more than hold down Adams in order to gain control of him.

The undisputed facts and videotape evidence demonstrate that: (1) Adams fought another inmate in the block's open day area (Doc. 29 ¶ 23; Doc. 29-4, at 9); (2) Defendant Gist attempted to pull Adams off the other inmate, but Adams resisted and attempted to continue fighting the inmate (Doc. 29 ¶¶ 28, 30; Doc. 29-4, at 9); (3) another officer assisted Defendant Gist in restraining Adams, who continued to resist (Doc. 29 ¶¶ 31-33); (4)

17

Defendant Gist removed himself from on top of Adams, grasped Adams' shoulder and brought Adams to his feet (Doc. 29 ¶¶ 34-36); (5) after Adams was brought to his feet, he pulled away from Defendant Gist and said something to him; in turn, Gist shouted at Adams, a struggle ensued, and Adams was swiftly brought to the ground (Doc. 29 ¶¶ 37-43); (6) Defendant Gist knelt at Adams' side and held him down until other officers arrived (Doc. 29 ¶¶ 44); and (7) Defendant Gist resorted to force to effect compliance only after Adams fought another inmate and continued to resist.

For the first and second *Whitley* factors, there is undisputed evidence of a need to use force, and a reasonable juror could not find that attempts to restrain Adams were unreasonable or excessive. The fixed surveillance video, sans audio, commences with a fight between Adams and another inmate. Defendant Gist walks to the inmates and attempts to pull Adams off the other inmate, but Adams resists and continues to pull the other inmate's shirt. Once Gist separates the inmates, he puts Adams on his back and attempts to restrain him while Adams pushes back on Gist's chest and pulls Gist's shirt. Another officer then arrives and assists Gist in restraining Adams. A struggle ensues and the officers eventually restrain Adams' arms behind his back. Several other officers arrive on the scene. Gist and another officer lift Adams to his feet and begin to escort him. While escorting, Gist keeps his grasp on Adams' shoulder. Adams turns towards Gist and appears to say something to him. In response, Gist appears to shout at Adams, while maintaining his grasp on Adams' shoulder. Although not entirely clear on the video, Adams

18

appears to slip or fall during this interaction, and he is immediately restrained on the ground face first by Gist and several other officers. While Adams is on the ground, Gist kneels near his head and keeps his hand on Adams' shoulder. Defendant Gist then steps away, and another officer takes his place. The other officers then lift Adams to his feet, place him in a restraint chair, and escort him off the block.

The videotape of the incident decisively refutes any claim that Defendant Gist applied force in an intentionally malicious or sadistic manner. *See Jones v. Wetzel*, 2017 WL 4284416, at *10 (M.D. Pa. Sept. 27, 2017) (granting summary judgment where videotape evidence "clearly undermine[d] any potential determination that [there] was a malicious or sadistic use of force."). Nothing in the movements or body language of Gist supports an inference of malicious or intentional misconduct. Gist is securing an inmate who just got into a fight with another inmate in an open area and continued to resist the officers' efforts to restrain him. Defendant Gist never strikes Adams and appears to show restraint despite Adams' recalcitrance. Consequently, the first two factors weigh in favor of summary judgment.

The third *Whitley* factor considers the extent of the injury inflicted. It is undisputed that Adams sustained injuries as a result of this incident, including a laceration to his upper lip that required stitches, back and neck pain, and a lesion on his upper right temporal lobe. (Doc. 29 ¶¶ 51-56; Doc. 29-10, at 35-69). On the evening of the incident (March 12, 2024), Adams was transported by ambulance to the emergency room. (Doc. 29-10, at 56-58). He

remained in the hospital until March 14, 2024. (*Id.* at 33). A report from the attending Physician's Assistant on March 14, 2024 stated as follows: "all testing showed no acute injuries. [Inmate's] reported symptoms spontaneously resolved, [inmate] up and ambulating at [outside hospital]. [Patient] to be discharged today." (*Id.*). Defendant does not argue, and the record does not support that Adams' injuries were de minimis. (*See* Doc. 30, at 17-18). While Adams did suffer injuries during the incident, that factor alone is insufficient to overcome the ample evidence supporting the reasonableness of the application of force.

As to the fourth factor, there was a reasonable threat to the officers' safety, as well as other inmates' safety. The purpose in securing Adams was initially in response to a fight with another inmate. In response to this incident, Defendant Gist and other officers attempted to restrain Adams, who was combative. Adams admits that he was fighting another inmate and was actively resisting. (Doc. 29-4, at 9; Doc. 29-7, at 3). Adams' actions put his own safety, as well as the officers' safety, at risk. Given Adams' disruptive behavior, Defendant Gist's response was objectively reasonable under the circumstances. This factor decidedly favors summary judgment.

As to the fifth factor, the record reflects that the force ceased when the officers regained control. Courts must bear in mind that drawing a line as to where force should cease must be approached practically, "'from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight,' making 'allowance for the fact that [ ] officers are often forced to make split-second judgments—in circumstances that are tense,

uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation.'" *Johnson v. City of Philadelphia*, 837 F.3d 343, 350 (3d Cir. 2016) (quoting *Graham v. Connor*, 490 U.S. 386, 396-97 (1989)).  This factor, like each of the others, supports summary judgment.

In summary, the record evidence would lead a reasonable trier of fact to find that Defendant Gist used the amount of force necessary to control Adams under the circumstances.  *Tindell v. Beard*, 351 F. App'x 591 (3d Cir. 2009); *see also Whitley*, 475 U.S. at 319; *Fuentes v. Wagner*, 206 F.3d 335, 346 (3d Cir. 2000) (noting that even a prison officer's "over-reaction" to an inmate-caused disturbance would fall short of supporting a finding of excessive force where the totality of the circumstances indicated that the force was applied in a good faith effort to maintain order).  No portion of the record supports an assertion that Defendant Gist acted maliciously or sadistically to cause harm.  In addition, Gist never struck Adams.  Rather, he acted to gain control over an inmate that fought with another inmate and resisted officers.

The party adverse to summary judgment must raise "more than a mere scintilla of evidence in its favor" in order to overcome a summary judgment motion and cannot survive by relying on unsupported assertions, conclusory allegations, or mere suspicions.  *Williams v. Borough of West Chester, Pa.*, 891 F.2d 458, 460 (3d Cir. 1989).  Adams has failed to meet this burden.  He failed to file a response to Defendant's statement of material facts and failed to submit any evidence to refute Defendant's exhibits.  It is clear on the record

that Defendant Gist acted in a good faith effort to restore order and discipline.  Defendant

Gist is therefore entitled to an entry of summary judgment on Adams' Eighth Amendment

excessive force claim.

      C.    <u>Qualified Immunity</u>

Even if Adams had stated a colorable claim, Defendant Gist is nevertheless entitled

to qualified immunity from this claim for damages.  In order to establish a civil rights claim,

Adams must show the deprivation of a right secured by the United States Constitution or the

laws of the United States.  However, government officials performing "discretionary

functions," are insulated from suit if their conduct did not violate a "clearly established

statutory or constitutional right[ ] of which a reasonable person would have known." *Wilson

v. Layne*, 526 U.S. 603, 609 (1999).

"The doctrine of qualified immunity protects government officials from liability for civil

damages insofar as their conduct does not violate clearly established statutory or

constitutional rights of which a reasonable person would have known." *Pearson v.

Callahan*, 555 U.S. 223, 231 (2009) (internal quotation marks omitted).  "Qualified immunity

balances two important interests—the need to hold public officials accountable when they

exercise power irresponsibly and the need to shield officials from harassment, distraction,

and liability when they perform their duties reasonably." *Pearson*, 555 U.S. at 231.  It

"provides ample protection to all but the plainly incompetent or those who knowingly violate

the law." *Malley v. Briggs*, 475 U.S. 335, 341 (1986).  "Thus, so long as an official

reasonably believes that his conduct complies with the law, qualified immunity will shield

that official from liability." *Sharp v. Johnson*, 669 F.3d 144, 159 (3d Cir. 2012) (citing

*Pearson*, 555 U.S. at 244). Although qualified immunity is generally a question of law that

should be considered at the earliest possible stage of proceedings, a genuine dispute of

material fact may preclude summary judgment on qualified immunity. *Giles v. Kearney*, 571

F.3d 318, 325-26 (3d Cir. 2009).

A qualified immunity determination involves a two-pronged inquiry: (1) whether a

constitutional or federal right has been violated; and (2) whether that right was "clearly

established." *Saucier v. Katz*, 533 U.S. 194, 201 (2001), *overruled in part by Pearson*, 555

U.S. at 236 (permitting federal courts to exercise discretion in deciding which of the two

*Saucier* prongs should be addressed first).

In the specific factual context of excessive force claims based upon allegations

relating to a prisoner's handcuffing, or the use of OC spray, courts have acknowledged that,

in certain instances, summary judgment is entirely appropriate. *Gilles v. Davis*, 427 F.3d

197, 207 (3d Cir. 2005). With respect to these particular excessive force claims, courts

agree that: "[i]n these cases, summary judgment for an officer who claims qualified immunity

is appropriate where, 'after resolving all factual disputes in favor of the plaintiff,[ ] the

officer's use of force was objectively reasonable under the circumstances.'" *Id.* (citing *Kopec

v. Tate*, 361 F.3d 772, 777 (3d Cir. 2004)).

Viewing the actions of Defendant Gist in the light depicted by the videotape, the

Court finds that Defendant is entitled to qualified immunity.  The force applied in this case

was to gain compliance over an inmate that was fighting with another inmate and resisting

officers.  Thus, nothing in the measured and restrained conduct depicted in the video could

have alerted Gist that his actions violated "clearly established statutory or constitutional

rights of which a reasonable person would have known."  *Wilson*, 526 U.S. at 609.

Therefore, Defendant Gist is entitled to qualified immunity from damages in this case.

D.    Supplemental Jurisdiction Over the State Law Claims

A court "may decline to exercise supplemental jurisdiction [over state law claims] if ...

the district court has dismissed all claims over which it has original jurisdiction."  28 U.S.C. §

1367(c)(3).  The decision of whether to exercise supplemental jurisdiction where a court has

dismissed all federal claims is left to the court's discretion as "pendent jurisdiction is a

doctrine of discretion, not of plaintiff's right."  *United Mine Workers of Am. v. Gibbs*, 383 U.S.

715, 726 (1966).  When all federal claims are eliminated before trial, "the balance of factors

to be considered under the pendent jurisdiction doctrine—judicial economy, convenience,

fairness, and comity—will point toward declining to exercise jurisdiction over the remaining

state-law claims."  *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 n.7 (1988).

As no federal claims remain in this case against Defendant Gist, the Court declines

to exercise supplemental jurisdiction over Adams' state law tort claims, including any

attempted negligence and assault and battery.  *See* 28 U.S.C. § 1367(c)(3); *Hedges v.*

24

*Musco*, 204 F.3d 109, 123 (3d Cir. 2000). These state law claims therefore will be dismissed without prejudice, and Adams may refile his state law claims in the appropriate state court if he so chooses.[5]

## IV.    Conclusion

For the foregoing reasons, Defendant Gist's Rule 56 motion (Doc. 28) for summary judgment will be granted in part and denied in part. A separate Order shall issue.


Robert D. Mariani
United States District Judge

Dated: January 20th, 2026

---

[5]    Because the Court declines to exercise supplemental jurisdiction over these state law claims, the Court declines to address Defendant's arguments concerning sovereign immunity as a defense to these state tort claims.